# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### May 7, 1998 Session

## ROBERT LAFFERTY, ET AL. v. CITY OF WINCHESTER, ET AL.

**Appeal from the Circuit Court for Franklin County**
**No. 10,025-CV     J. Curtis Smith, Judge**

---

**No. M1997-00224-COA-R3-CV - Filed December 7, 2000**

---

This appeal involves a dispute between the owners of a bed and breakfast and the City of Winchester regarding a proposed expansion of the business's bar and banquet facilities. When the city's Board of Zoning Appeals declined to approve the expansion, the owners of the bed and breakfast filed a petition for a common-law writ of certiorari in the Circuit Court for Franklin County challenging the Board's decision. After reviewing the record of the proceedings before the Board, the trial court determined that the Board acted within its discretion when it declined to approve the proposed expansion of the bed and breakfast. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which HENRY F. TODD, P.J., M.S., and BEN H. CANTRELL, J., joined.

Robert S. Peters, Winchester, Tennessee, for the appellants, Robert Lafferty and Phyllis Lafferty.

Thomas C. Faris, Winchester, Tennessee, for the appellee, City of Winchester.

## OPINION

Wade and Stephanie Anderton owned an architecturally significant house located on State Highway 50 in Franklin County. The house was built before the Civil War and was situated on a one and one-half acre tract. In early 1994, the Andertons decided to convert the house into a bed and breakfast and obtained a business license for their new endeavor. In March 1994, the City of Winchester annexed the Andertons' property. Although the city eventually zoned the property as "municipal R-1, Low Density Residential," it "grandfathered" in the Andertons' incipient bed and breakfast as a nonconforming commercial use.[1]

---

[1]A person's lawful use of property existing before the enactment of a zoning ordinance is commonly referred to as a "nonconforming use." 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 6.01 (4th ed. 1995) ("American Law of Zoning"). A nonconforming use is considered "grandfathered" when the use is specifically exempted from the ordinance's application on grounds that the property was being used that way when the ordinance took effect. *Town of Orono v. LaPointe*, 698 A.2d 1059, 1062 (Me. 1997) and Bryan A. Garner, *A Dictionary of Modern Legal Usage* 390 (2nd ed. 1995).

Later in 1994, Robert and Phyllis Lafferty purchased the property and entered into an informal partnership with the Andertons to develop the bed and breakfast, which had been named the Antebellum Inn. The Laffertys and the Andertons presented plans to the city planning commission showing that the inn would have three rented bedrooms and a dining facility large enough to accommodate as many as one hundred and twenty-five persons. They told the commission that the inn would be a lodging and dining establishment that could accommodate social events such as wedding receptions and private parties. They also stated that the inn could be used as a meeting place for other organizations such as charities and civic clubs. In August 1994, the commission approved the proposed site plan for the Antebellum Inn. Even though the commission considered zoning the property as commercial,[2] it elected to leave the inn as a grandfathered, nonconforming commercial use in a residential zone.

The Antebellum Inn could not serve alcoholic beverages when it first opened. However, after it opened, the residents of Winchester approved the sale of liquor-by-the-drink, and the city began to license establishments to sell alcoholic beverages for on-premise consumption. The Laffertys, who by this time were the sole operators of the Antebellum Inn, sensed that serving alcoholic beverages would increase their business. Accordingly, they applied for a liquor license and also sought the city's permission to construct a 20' × 20' one-story addition to provide space for an ice machine, coolers, and storage space for the beverages. The city approved the site plan for the 20' × 20' addition. However, without the city's knowledge, the Laffertys, going way beyond the plan they had submitted to the city, constructed a two-story, 20' × 38' addition to the inn. Once the addition was completed, the Laffertys turned it into a bar called the Green Door Pub. The pub had an outside entrance which enabled its patrons to enter and leave the pub without entering the inn.

The Laffertys, by their own admission, were having a difficult time operating the Antebellum Inn solely as a bed and breakfast with occasional social functions. They saw the Green Door Pub as the key to profitability. In time, the Laffertys began to play up the bar side of their business. Like many bars, they sometimes featured live music on the weekends, so that, as Ms. Lafferty put it, people "[could] dance if they want[ed] to." They also constructed a gazebo with a concrete floor for outdoor events. These events sometimes featured live music and attracted patrons who would pay a cover charge to attend.

The outdoor events at the Laffertys' bar occasionally became loud enough to provoke complaints from the neighbors. Eventually, the Laffertys decided to deal with these complaints by building a 38' × 40' banquet room "with maximum allowance sound absorption" and to move their outdoor activities inside. The Laffertys began constructing the foundation for the new addition before they obtained a building permit. When the building inspector discovered that they had already started construction, he directed the Laffertys to stop work until they obtained the city's approval to expand their business. The Laffertys did not completely abide by the stop-work order after it was issued.

---

[2]The commission would have been required to engage in spot zoning had it decided to zone the inn property residential. Spot zoning refers to the practice of singling out a piece of property for a use classification totally different from that of the surrounding area. 1 American Law of Zoning § 5.12.

Stymied by the stop-work order, the Laffertys eventually submitted plans for the proposed addition to the Board of Zoning Appeals. The plans called for a large, basically unpartitioned, rectangular room interrupted only by a set of bathrooms and a small area for an ice machine. The Board conducted a ninety minute hearing concerning the Laffertys' proposed addition. According to the Board's minutes, Ms. Lafferty

> informed the Board that there was live music on special occasions. The live music occurred only when specified by a lessee as a part of a catering contract for a special event, i.e., wedding reception, etc. Mrs. Lafferty also explained that the proposed addition would allow their outdoor activities to move inside, thereby closing in the music and eliminating the noise.

Others present at the meeting complained about the noise and traffic congestion caused by the Green Door Pub.[3] The Board began its deliberations after both sides had their say. The Board members found themselves in a quandary because, while they continued to favor the original concept of the bed and breakfast with occasional social functions, they believed that the current activities at the Green Door Pub were beyond what they originally envisioned. Eventually, the Board denied the Laffertys' application for a building permit without a dissenting vote.[4]

---

[3]The Board's minutes summarized these comments as follows:

> Mr. Steve Waldron, developer/owner of [neighboring] North Point Subdivision, stated that the noise was not the only issue. Another [issue] was the devaluation of neighboring property values. Mr. Waldron ha[d] six or seven lots facing the Antebellum Inn. James Weaver, [another] neighbor, stated that the police records [would] show that there [were] complaints about activities at the Inn. Mr. Wade Anderton, one of the nearest neighbors, stated that [the Inn was] no longer a "Bed and Breakfast." He also stated that he was assured as a former partner of the Laffertys that the zoning would remain R-1 [Low-Density Residential] and felt that the neighboring property would devalu[e] due to [the proposed] expansion. He also wanted it noted that he had attended events where a coverage charge was collected, drinks were served to the public and live music was present. Judy Baker, [another] neighbor, commented that she objected to the drinking and dancing happening nightly.

[4]The Board's minutes summarized the Board's deliberation and vote as follows:

> Mayor Bean, attempting a compromise, stated that maybe everything moving inside would help resolve some of the issues. [Board member] Richard Bagby made the motion to recognize the quality of the establishment, etc. but to reject the expansion based upon [the city's] initial understandings of the activities regarding the Antebellum Inn. [Board member] Thomas Elliott seconded the motion. In discussion [Board member] Bill Cowan stated that in good faith, the original concept of a 'bed and breakfast' and a restaurant facility was allowed as a nonconforming use. However, recent activities may have gone beyond that concept. [Chairperson] Jackie Rose abstained from the vote. All other members voted in favor of said motion [rejecting the proposed expansion].

After the Board declined to issue the building permit for their expansion, the Laffertys filed a *pro se* action in the Circuit Court for Franklin County seeking to enjoin the city from enforcing the building inspector's stop-work order. The trial court initially issued a restraining order but promptly dissolved it when the city protested. The Laffertys then hired a lawyer and, on December 2, 1996, filed a petition for a common-law writ of certiorari requesting the trial court to review the Board's refusal to permit the construction of the 38' × 40' addition. They also requested that the certiorari proceeding be consolidated with their pending *pro se* action. The trial court granted the writ of certiorari but dismissed the *pro se* action with prejudice after concluding that the common-law certiorari proceeding supplanted the Laffertys' *pro se* suit.

Following a hearing in May 1997, the trial court entered an order containing the following findings and conclusions. First, the trial court found that the original designation of the Antebellum Inn as a bed and breakfast was, for zoning purposes, a permissible nonconforming commercial use in a residential area. Second, it found that the Laffertys were operating a bar in addition to the bed and breakfast contrary to the representations they had made to the beer board and the planning commission.[5] Third, the trial court found that the current structure contained more than enough room for the operation of the bed and breakfast. Accordingly, the trial court concluded that "the new proposed building [was] not a reasonable extension of a pre-existing nonconforming use" and, therefore, that the Board had acted within its discretion when it refused to approve the Laffertys' latest proposed addition. The trial court capped off its ruling by directing the Laffertys to remove the foundation for the 38' × 40' addition that had been constructed before the stop-work order had been issued.

# I.

Our inquiry in this case is straightforward. The Antebellum Inn sits in a residential area of the City of Winchester. Because the inn existed, at least nascently, when the city annexed the property, it has been permitted to continue to operate as a commercial bed and breakfast establishment even though it is located in an area zoned residential. As a nonconforming use, the inn may expand but only as a bigger and better bed and breakfast. Without the approval of the Board, it cannot transform itself into something other than a bed and breakfast. The central issue in this lawsuit is whether the Laffertys seek to expand the Antebellum Inn beyond what the zoning laws permit or, as succinctly stated by the Board's lawyer at trial, whether the Laffertys "have pushed the envelope beyond where it should ever have been."

This court recognizes that zoning is a fact of modern life. The days of Uncle Dave Macon, when most Tennesseans lived on more or less remote farms or in small communities, are gone. Towns, urban centers, and subdivisions, have largely replaced the rural environment of the past. Increasingly, local governments of all stripes have undertaken to harness local growth and to encourage orderly development through the use of planning and zoning measures. Lee S. Greene, et al., *Government in Tennessee* 351 (4th ed. 1982) ("*Government in Tennessee*"). As the pressure to convert farmland into subdivisions, apartment complexes, condominiums, and shopping centers

---

[5] In the trial court's words, the Laffertys "crossed over the line of the [permitted nonconforming] use when the bar facility was constructed and they got into the nightclub business."

has increased, zoning ordinances have become major tools to implement land-use planning at the local level. *Government in Tennessee* at 357-63.

Local governments lack the inherent power to control the use of private property within their boundaries. This power belongs to the State of Tennessee. However, the General Assembly may delegate the power to local governments, *Henry v. White*, 194 Tenn. 192, 196, 250 S.W.2d 70, 71 (1952); *Anderson County v. Remote Landfill Servs., Inc.*, 833 S.W.2d 903, 909 (Tenn. Ct. App. 1991), and, in fact, began doing so in 1935. *KLN Assocs. v. Metropolitan Dev. & Hous. Agency*, 797 S.W.2d 898, 902 n.3 (Tenn. Ct. App. 1990). Local governments' power to employ zoning measures to control the use of land in their boundaries is now firmly established. *Draper v. Haynes*, 567 S.W.2d 462, 465 (Tenn. 1978).

Zoning ordinances are now the most prevalent type of local land use control. 1 American Law of Zoning § 1.14. In the most general terms, zoning involves the territorial division of land into districts according to the character of the land and buildings, their suitability for particular purposes, and the uniformity of these uses. *Family Golf of Nashville, Inc. v. Metropolitan Gov't of Nashville*, 964 S.W.2d 254, 258 (Tenn. Ct. App. 1997). Zoning regulations focus primarily on the use of the property and the architectural and structural designs of the buildings. *In re Sundance Mountain Ranches, Inc.*, 754 P.2d 1211, 1213 (N.M. 1988); *Kaufmann v. Planning & Zoning Comm'n*, 298 S.E.2d 148, 153 (W. Va. 1982); 1 E.C. Yokley, *Zoning Law & Practice* §§ 1-2 (4th ed. 1978).

Rarely, if ever, have local governments enacted zoning ordinances on a completely clean slate. Property is usually already in use when it is first zoned, and so it is inevitable that ideal zoning theory will clash with the existing use of particular pieces of property. In order to avoid the legal problems that would attend a local government's efforts to force a private property owner to discontinue an otherwise permissible use of property, Tenn. Code Ann. § 13-7-208(b) (1999) requires local governments to permit certain types of pre-existing nonconforming uses to continue even if they are inconsistent with the zoning classification of the surrounding property.

Property owners whose property qualifies as a nonconforming use under Tenn. Code Ann. § 13-7-208(b) may expand their business operations or may even reconstruct their business premises, as long as they continue to be engaged in the same business that they were engaged in when the zoning ordinance was passed. *421 Corp. v. Metropolitan Gov't of Nashville*, No. M1997-00212-COA-R3-CV, 2000 WL 488137, at *4 (Tenn. Ct. App. Apr. 26, 2000); Tenn. Code Ann. §§ 13-7-208(c), (d). However, these provisions do not permit an established nonconforming use to be changed to some other nonconforming use. 1 American Law of Zoning § 6.36. Thus, like many other local zoning ordinances, Winchester's zoning ordinance requires that a property owner who desires to change the use of property from one nonconforming use to another nonconforming use must first obtain the written approval of the Board of Zoning Appeals. Winchester, Tenn. Zoning Ordinance § 6.020 (1988).

Whether characterized as administrative or quasi-judicial, *Wilson County Youth Emergency Shelter, Inc. v. Wilson County*, 13 S.W.3d 338, 342 (Tenn. Ct. App. 1999), decisions by local zoning boards and officials involve the exercise of the local government's police power to protect the health, safety, and welfare of their citizens. *Draper v. Haynes*, 567 S.W.2d at 465; *Hoover, Inc. v.*

*Metropolitan Bd. of Zoning*, 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997). In recognition of the policy that favors permitting the community decision-makers closest to the events to make the decision, the courts refrain from substituting their judgments for the broad discretionary power of the local governmental body. *McCallen v. City of Memphis*, 786 S.W.2d 633, 641-42 (Tenn. 1990); *Whittemore v. Brentwood Planning Comm'n*, 835 S.W.2d 11, 15 (Tenn. Ct. App. 1992).

The common-law writ of certiorari provides the procedural vehicle for reviewing the decisions by local zoning boards. This writ affords quite limited judicial review. *421 Corp. v. Metropolitan Gov't of Nashville*, 2000 WL 488137, at *2. It empowers the courts to determine whether the local zoning board exceeded its jurisdiction; followed an unlawful procedure; acted illegally, arbitrarily, or fraudulently; or acted without material evidence to support its decision. *Fallin v. Knox County Bd. of Comm'rs*, 656 S.W.2d 338, 342-43 (Tenn. 1983); *Hoover, Inc. v. Metropolitan Gov't of Nashville*, 955 S.W.2d at 54; *Hemontolor v. Wilson County Bd. of Zoning Appeals*, 883 S.W.2d 613, 616 (Tenn. Ct. App. 1994).

When the evidentiary foundation for a local zoning board decision is challenged using the common-law writ, the sufficiency of the evidence is a question of law. Hence, the courts must review the record de novo without presuming that the board's finding is correct. *Wilson County Youth Emergency Shelter, Inc. v. Wilson County*, 13 S.W.3d at 342. This review does not permit the courts to reweigh the evidence, *Hoover, Inc. v. Board of Zoning Appeals*, 924 S.W.2d at 904, or to scrutinize the intrinsic correctness of the decision. *421 Corp. v. Metropolitan Gov't of Nashville*, 2000 WL 488137, at *2. It envisions that the court will review the record independently to determine whether it contains "such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion." *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992). A decision by a local zoning board will be considered arbitrary only when there is no evidence in the record to support it. *Sexton v. Anderson County*, 587 S.W.2d 663, 667 (Tenn. Ct. App. 1979).

## II.

Winchester's Board of Zoning Appeals knew that the Laffertys' property was in an area zoned residential and that the commercial use of their property as a bed and breakfast had been grandfathered in as a nonconforming use. The Board also knew about the first addition to the inn and that the Laffertys had misrepresented that the addition was nothing more than added storage space when, in fact, it was intended to be used for a bar called the Green Door Pub. At the hearing, the Board learned that the Laffertys regularly held dances at the Green Door Pub for which they imposed a cover charge. The Board also learned that the Laffertys had actually started to build another large addition to expand their bar without first obtaining the city's approval and that they had continued to erect the addition even after the stop-work order was issued.

In addition to the Laffertys' less than candid dealings with the city officials, the Board heard complaints from their neighbors that the live music at the Green Door Pub created a noise problem in the neighborhood. The Laffertys' neighbors told the Board that they objected to what one woman described as "the drinking and dancing happening nightly." They also expressed their concern that the operation of the Green Door Pub was harming the value of their property.

We are mindful that the mere complaints and fears of neighboring property owners do not provide the material evidence necessary to support a board's denial of an otherwise proper request. *Wilson County Youth Emergency Shelter, Inc. v. Wilson County*, 13 S.W.3d at 342-43; *Hedgepath v. Norton*, 839 S.W.2d at 421. As we have said before, "it is not a function of the Board to conduct a referendum on public attitudes relative to the petition." *Sexton v. Anderson County*, 587 S.W.2d at 664 n.1. In this case, however, the Board was not simply reacting to the neighbors' complaints. If anything, the surrounding property owners' complaints regarding the nightly activities at the Green Door Pub corroborated the Board's impression that the Laffertys' pub had, in one Board member's words, "gone beyond [the original] concept" of a lodging place that catered small, private get-togethers.

The most telling material evidence supporting the Board's action are the undisputed circumstances surrounding the construction and subsequent use of the first addition to the inn. The Laffertys portrayed this addition one way in order to obtain approval for it, and then, after obtaining approval, they used the addition for something completely different. Accordingly, the Laffertys were able to transform a one-story 20' × 20' storage addition into a two-story public bar with a separate outside entrance. The Laffertys high-handedness no doubt weighed on the Board's mind in considering their request for another addition and undermined the credibility of their explanation about their plans for the 38' × 40' addition to the Green Door Pub. It seems logical to us that at some point the Board looked at what was before it, considered the track record of the property owners, remembered what had happened with the first addition, and began to think, "We've been down this road before."

In a common-law certiorari proceeding such as this one, it is not necessary that we agree with the Board's refusal to approve the Laffertys' proposed 38' × 40' addition to the Green Door Pub. It is only necessary that we find that the Board did not act illegally, arbitrarily, or capriciously. The record contains material evidence from which the Board could have rationally concluded that the proposed addition would have further expanded the Antebellum Inn into a commercial activity quite different from its original nonconforming use – a bed and breakfast that would be able to accommodate occasional small social events. Accordingly, the Board could rightly withhold approval of the expansion on grounds that it would have changed the way the property was being used to a different nonconforming use. Therefore, we agree with the trial court's conclusion that the Board did not err by rejecting the Laffertys' latest plan to add another room to the west side of the Antebellum Inn.

### III.

We affirm the judgment and remand the case to the trial court for whatever further proceedings consistent with this opinion may be required. We also tax the costs of this appeal to Robert Lafferty and Phyllis Lafferty, jointly and severally, and to their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

-7-