# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### APRIL 20, 2010 Session

## LAKELAND COMMONS, L.P. v. TOWN OF LAKELAND, TENNESSEE, ET AL.

### Direct Appeal from the Chancery Court for Shelby County
#### No. 09-0007-2     Arnold Goldin, Chancellor

---

### No. W2009-01859-COA-R3-CV - May 25, 2010

---

Developer sought approval to construct a planned development containing retail and office uses on property zoned in an agricultural district. The municipal planning commission recommended that the town's board of commissioners deny the application for several reasons. Following a public hearing, the board of commissioners voted to deny the application based upon the recommendation of the municipal planning commission. The developer then brought a common law certiorari action, alleging that the board acted arbitrarily and illegally in denying its application. The trial court found that the board's decision was based upon substantial and material evidence and dismissed the developer's petition. The developer appeals. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Robert L. Winchester, Jr., Memphis, Tennessee, for the appellant, Lakeland Commons, L.P.

John D. Burleson, Jesse D. Nelson, Jackson, Tennessee, for the appellees, Town of Lakeland, Tennessee, et al

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

Lakeland Commons, LP ("Petitioner") purchased real property in the Town of Lakeland, Tennessee.  Petitioner's property is zoned "AG – Agricultural District."  The Lakeland Municipal Zoning Ordinance describes the "AG – Agricultural District" as follows:

> The intent of the AG Agricultural District is to provide suitable areas for single family residential development that are free from conflicting residential uses with the purpose of maintaining the rural atmosphere in the outlying areas of the City.  These areas do not require extensive municipal services (e.g. public water and sewer) and may also be used for forestry and agricultural services.  Single family residential development is allowed at a density no greater than .20 units per acre (1 unit per 5 acres).

Art. IV, § 1(A).  Petitioner's property is currently surrounded by vacant land, forest, and agricultural use to the north, south, and east.  A stream known as Scotts Creek forms the western boundary of the site, and several estate home lots are located past Scotts Creek.

In 2006, a committee developed an update to Lakeland's Comprehensive Land Use Plan after numerous public meetings and land use studies.  During the process, three main areas of the Town were identified – the North, the South, and the Central Zone.  It was projected that the Central Zone of Lakeland, where Petitioner's property is located, is likely to eventually contain up to sixty percent of Lakeland's ultimate future population.[1]  While there were adequate commercial and "Residential Support Centers" proposed for the North and South Zones of Lakeland, the commercial and residential support uses in the Central Zone were deemed inadequate.  As such, the updated Land Use Plan designated an area including the property now owned by Petitioner[2] as a "Residential Support Center," which was described as follows:

> Primarily planned developments containing neighborhood commercial uses with no one user having greater than 75,000 square feet, limited office,

---

[1]  According to a consultant who worked with the committee, "Population projections for a residential buildout were made and it was determined that Lakeland would likely reach buildout in 2025 with a population of 30,000."  In 2007, the Central Zone became the most populous zone, but its population was only 5,100.

[2]  It appears that Petitioner purchased the subject property a few months after the Comprehensive Land Use Plan was updated.

religious facilities, schools[,] public buildings, and institutional uses. Development requires public water and sanitary sewer service. Streets shall be designed with an urban cross-section.

The updated Land Use Plan was adopted by resolution by Lakeland's Municipal Planning Commission, but apparently, it was not adopted by the Town's chief legislative body, the Board of Commissioners.[3]

Lakeland's Municipal Zoning Ordinance provides that Planned Developments are permitted in the AG Agricultural District, but they require "a Special Permit with a recommendation from the Planning Commission and approval of the Board of Commissioners." The Zoning Ordinance provides that "[t]he Board of Commissioners may, upon proper application and review, grant a Special Permit for a Planned Development," and it defines the word "may" as "permissive." Art. VI, § 2(A); Art. II, § 1(A)(3). In addition, the Zoning Ordinance states that the Board of Commissioners may grant a Special Permit "upon written findings and recommendations by the Planning Commission . . . ."[2] Art. VI, § 3(A).

Petitioner submitted a preliminary development plan for a Planned Development to be known as Lakeland Commons. Lakeland Commons would include retail and office uses in a commercial development of approximately 220,000 square feet on 42 acres. According to the proposal, prospective tenants of Lakeland Commons included, but were not limited to, a large retail grocery anchor, financial institutions, dining services, fashion merchandise, neighborhood retail shops, real estate offices, insurance offices, and medical offices. Members of Lakeland's city planning department prepared a report and recommended that the Municipal Planning Commission recommend approval of Petitioner's preliminary

---

[3] The chief legislative body of any municipality may create and establish a municipal planning commission. Tenn. Code Ann. § 13-4-101(a)(1). Members of the planning commission must attend annual training and continuing education programs on land use and related issues unless the legislative body provides otherwise. Tenn. Code Ann. § 13-4-101(c). "It is the function and duty of the [municipal planning] commission to make and adopt an official general plan for the physical development of the municipality," which plan "shall show the commission's recommendations for the physical development of the area . . . ." Tenn. Code Ann. § 13-4-201. The legislative body, by ordinance, *may* enact the zoning plan recommended by the planning commission, Tenn. Code Ann. § 13-4-202(b), but it is not obligated to do so. *Family Golf of Nashville, Inc. v. Metro. Gov't of Nashville*, 964 S.W.2d 254, 258 (Tenn. Ct. App. 1997).

[2] Tennessee Code Annotated section 13-4-103 provides that municipal planning commissions "may make reports and recommendations relating to the plan and development of the municipality to public officials and agencies . . . ."

development plan, with certain conditions.[3]  However, following a public hearing, the Municipal Planning Commission voted four to one to recommend that the Board of Commissioners deny approval of Petitioner's plan. Lakeland's growth management director prepared a memorandum for the Board of Commissioners stating that the Municipal Planning Commission had voted to recommend denial of the preliminary development plan, and the memo provided,

> Some reasons for denial stated at the meeting included:
>
> 1.   The City Major Road Plan Update is in progress, and could impact the development.
> 2.   Farr Associates new land development regulations and zoning recommendations are in progress, and may offer differing recommendations for this area.
> 3.   The information for the Garner Lake Dam Breach area was not fully detailed or sufficient.
> 4.   Existing approvals or zoned lands are not yet developed, and their development could be impacted by this project.
> 5.   There was little analysis in the traffic study for peak hour traffic.
> 6.   No disposition has been arrived at with [Memphis Light Gas & Water] regarding the burial of overhead electrical lines.[4]

The matter then proceeded to the Board of Commissioners for its consideration.  The Board of Commissioners held a public hearing on November 6, 2008.  Numerous citizens addressed the Board, with eleven speaking in favor of the Lakeland Commons plan and fifteen speaking in opposition to it.  Several representatives of Lakeland Commons, including developers and attorneys, addressed the Board as well.  The Board also had various documents before it, including, among other things, the memorandum containing the reasons for the Municipal Planning Commission's recommendation, various documents and reports from the city planning department recommending approval of the preliminary development plan, and a large bound volume containing Petitioner's application, along with studies, charts, and illustrations relating to its proposal.  At the conclusion of the hearing, one of the Commissioners moved to deny approval of the preliminary development plan based on the

---

[3] Lakeland's Zoning Ordinance provides that "[t]he response from the City of Lakeland Staff shall not be binding upon the City of Lakeland Planning Commission or Board of Commissioners."  Art. VI, § 4(A)(4).

[4] A seventh reason for denial, stated on the record by the Municipal Planning Commission, but omitted from the memo, was that there were "[c]oncerns of not being able to fill current businesses and developments."

-4-

recommendation of the Municipal Planning Commission. The motion was seconded, and it passed by a vote of four to one. Thus, Petitioner's application was denied.

Petitioner then filed a petition for writ of certiorari in the chancery court of Shelby County, alleging that the decision of the Board of Commissioners was illegal, arbitrary and capricious, and "motivated by political, personal, or other factors." The chancery court issued the writ, and the respondents, being the Town of Lakeland and the Board of Commissioners, filed the record of the proceedings before the Board of Commissioners. After reviewing the record and hearing arguments from counsel, the chancery court entered an order denying the petition, with the following findings:

> The Board of Commissioners developed an extensive record on this matter, and the proponents and opponents, as well as the City planning staff and other personnel, fairly debated the issue. During the public hearing, the Board of Commissioners received substantial evidence which provides a rational and justifiable basis to deny the Plaintiff's application for [a preliminary development plan]. Before the Board of Commissioners was the [Municipal Planning Commission's] report containing its recommendation for denial and the facts received by the [Municipal Planning Commission] (cited in paragraph 7 above). The record of the Board of Commissioners at the November 7, 2008 hearing provides a factual and rational basis to substantiate the denial of the Plaintiff's [preliminary development plan] proposal. . . .
>
> . . . .
>
> In denying the Plaintiff's application and upholding the recommendation of the [Municipal Planning Commission], the Board of Commissioners neither exceeded its jurisdiction, followed an unlawful procedure, nor were its actions illegal, arbitrary, or fraudulent.
>
> The action of the Board of Commissioners denying the Plaintiff's application for a [preliminary development plan] was based upon material evidence in the record before it, including, without limitation, the findings and recommendations of the [Municipal Planning Commission] to deny [the preliminary development plan] and these facts provided a rational basis for the Board of Commissioners' action.

Petitioner timely filed a notice of appeal.

## II.   STANDARD OF REVIEW

Public and judicial policy favors permitting the community decision-makers closest to the events to make zoning and land use decisions, so courts must refrain from substituting

their judgment for the broad discretionary power of local governmental bodies. *Wadlyn Corp. v. City of Knoxville*, 296 S.W.3d 536, 544 (Tenn. Ct. App. 2008); *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758 (Tenn. Ct. App. 2000). "[C]ourts reviewing either zoning ordinances or the administrative decisions implementing zoning ordinances are inclined to give wide latitude to the responsible local officials." *Whittemore v. Brentwood Planning Comm'n*, 835 S.W.2d 11, 15 (Tenn. Ct. App. 1992).

A legislative body's decision to approve a planned development is administrative rather than legislative in nature when "the discretionary authority of the government body must be exercised within existing standards or guidelines." *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990); *see also* *Cost Enters., LLC v. City of Lebanon*, No. M2008-00610-COA-R3-CV, 2009 WL 856643, at *5 (Tenn. Ct. App. Mar. 31, 2009) (finding that the Lebanon City Council acted in an administrative capacity in denying an application for a planned development). We conclude that Article VI of the Lakeland Municipal Zoning Ordinance provides sufficient "means and guidelines" to require the Board of Commissioners to exercise reasonable discretion in considering an application for a planned development. Thus, the Board of Commissioners' decision in this case was administrative, and Petitioner properly challenged the action by a petition for writ of certiorari. *See McCallen*, 786 S.W.2d at 634.

"Review under the common law writ is limited to whether 'the inferior board or tribunal (1) has exceeded its jurisdiction, or (2) has acted illegally, arbitrarily, or fraudulently.'" *McCallen*, 786 S.W.2d at 638 (quoting *Hoover Motor Exp. Co. v. RR & Pub. Util. Comm'n*, 261 S.W.2d 233, 238 (Tenn. 1953)). The court may not reweigh the evidence or scrutinize the intrinsic correctness of the decision. *Lafferty*, 46 S.W.3d at 759. Instead, "the court will review the record independently to determine whether it contains 'such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion.'" *Id.* (quoting *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992)). The decision will be considered arbitrary only when there is no evidence in the record to support it. *Id.* (citing *Sexton v. Anderson County*, 587 S.W.2d 663, 667 (Tenn. Ct. App. 1979)).

> An action will be invalidated only if it constitutes an abuse of discretion. If "any possible reason" exists justifying the action, it will be upheld. Both legislative and administrative decisions are presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action.

*McCallen*, 786 S.W.2d at 641.

In reviewing the decision of an administrative tribunal under a common law writ of certiorari, this Court uses the same standard of review used by the trial court. *Wright v. Tenn. Peace Officer Standards & Training Comm'n,* 277 S.W.3d 1, 8 (Tenn. Ct. App. 2008) (citing *Ware v. Greene*, 984 S.W.2d 610, 614 (Tenn. Ct. App. 1998)). "The scope of review by the appellate courts is no broader or more comprehensive than that of the trial court with respect to evidence presented before the Board." *Watts v. Civil Service Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980). Thus, the issue before this Court, as we perceive it, is whether the Board of Commissioners acted arbitrarily and/or without material evidence to support its decision.

### III. DISCUSSION

Petitioner concedes on appeal that the Board of Commissioners was not required to approve its application simply because its proposal was consistent with the Land Use Plan adopted by the Municipal Planning Commission. Again, the Board of Commissioners apparently never adopted the Land Use Plan, nor was it required to. *See* Tenn. Code Ann. § 13-4-202(b). Lakeland's Zoning Ordinance only generally defines the term "land use plan" as follows:

> A general plan for the physical development of a particular area. The plan formulates a coordinated, *long-term* development pattern for the identified area and the creation of a *future* land use plan and accompanying map, a major road plan, and the identification of goals, objectives and policies to *guide* the physical development of the area.

Art. II, § 2 (emphasis added). The Zoning Ordinance made clear that the Board of Commissioners *may* grant a Special Permit for a Planned Development upon written findings and recommendations by the Planning Commission. *See* Art. VI, §§ 2(A), 3(A).

The Board of Commissioners did not issue written findings regarding its denial of Petitioner's application. "[A]s helpful as findings of fact might be in an administrative proceeding, administrative bodies such as [a board of zoning appeals] are not required to make specific findings of fact unless a statute or ordinance requires them." *Moore v. Metro. Bd. of Zoning Appeals*, 205 S.W.3d 429, 436 (Tenn. Ct. App. 2006) (citing *Weaver v. Knox County Bd. of Zoning Appeals*, 122 S.W.3d 781, 785 (Tenn. Ct. App. 2003)). Such findings "are not essential to judicial review under the material evidence standard." *Weaver*, 122 S.W.3d at 785. The parties have not cited any statute or section of the Lakeland Zoning Ordinance that would require the Board of Commissioners to make findings of fact when approving or denying an application for a planned development, nor have we encountered any.

The minutes of the Board of Commissioners' meeting simply state that a motion was made to "deny approval of Lakeland Commons Planned Development Plan, based on the recommendation of the Municipal Planning Commission," that the motion was seconded, and that it carried by a vote of four to one. The transcript of the hearing reveals that some of the individual Commissioners made comments about the proposal during the Board's deliberation prior to its vote. Petitioner argues on appeal that comments made by three of the Commissioners who voted to deny its application indicate that their decision was arbitrary and based upon improper considerations. First, Petitioner attacks the comments made by Commissioner Hartz. Commissioner (and Vice-Mayor) Hartz also served on the Municipal Planning Commission as the Board's liaison.[5] To avoid taking his statements out of context, we will recount his comments in full:

> Vice-Mayor Hartz: As liaison to the [Municipal Planning Commission], I move to recommend – I move that this board deny Lakeland Commons Development Plan based on the recommendation by the [Municipal Planning Commission].
> . . . .
> Vice-Mayor Hartz: It's probably not widely known by anybody in this room that I have spent a considerable amount of time with these developers trying to develop a plan that would be acceptable to the people of Lakeland. I failed.
>
> I worked as hard as anybody could from a position of – of – as an elected official to make this a workable situation that – where there would be consensus. And there is no consensus. There will be no consensus in this room at the end of the night.
>
> It's an emotional issue. There are arguments on both sides of the issue by valued friends and neighbors which contain validity from a limited perspective. Everybody in here has got their own view of it. Everybody in here is looking at it as if it were real to them and we've got varied opinions.
>
> But varied opinions do not define the common good. Consensus doesn't necessarily define the common good. And there's no one in this room wise enough to know what we'll need tomorrow or the week after or when we reach 60 percent population in the central part of Lakeland. We can only suppose.
>
> As difficult as it has proven to be to encourage public participation in recent history, as difficult as it has proven to obtain a sufficient number of qualified candidates who must serve on a voluntary basis, I therefore support

_____

[5] Section 14-101 of Lakeland's Code of Ordinances states that one member of the Municipal Planning Commission "shall be a member of the board of commissioners selected by said board of commissioners to serve as its liaison."

the efforts and opinions of the Lakeland Municipal Planning Commission which, in fact, has reviewed all the facts, listened to all the testimony and made a recommendation to this governing body in good faith.

On appeal, Petitioner argues that because Commissioner Hartz moved to deny its proposal "based on the recommendation of the [Municipal Planning Commission]," but did not specifically discuss any of the six concerns raised by the Commission, he impermissibly deferred to the recommendation of the Municipal Planning Commission simply to please its members. We disagree with Petitioner's characterization of Commissioner Hartz's comments. Again, it was not necessary for Commissioner Hartz to specifically state the reasons behind his vote. His comments that the proposal was not acceptable to the people of Lakeland and that it was not clear whether such a development would be needed "tomorrow or the week after" or even when the Central Zone reached its projected future population do not indicate to this Court that Commissioner Hartz was acting arbitrarily or illegally. Commissioner Hartz specifically recognized that valid arguments existed both in favor of the proposal and against it, and he stated that he supported "the efforts *and opinions* of the Lakeland Municipal Planning Commission which, in fact, has reviewed all the facts, listened to all the testimony and made a recommendation to this governing body in good faith." (emphasis added). Commissioner Hartz served as a member of the Municipal Planning Commission and, presumably, reviewed all the facts himself in that capacity.

The second Commissioner to comment was Commissioner Verschuur. Commissioner Verschuur stated that he initially did not intend to comment on the matter, but that he wanted to respond to some of the statements made by the representatives of Lakeland Commons who had addressed the Board. As noted earlier, one of the reasons why the Municipal Planning Commission recommended denial of the application was that "[t]he information for the Garner Lake Dam Breach area was not fully detailed or sufficient." Approximately 22 acres of the Lakeland Commons site lie within the Garner Lake Dam Breach Zone. Apparently, the Land Use Plan designated five hundred feet on each side of Scotts Creek as within the dam breach area.

One of the attorneys who spoke on behalf of Lakeland Commons implied that the dam was a non-issue, stating, "No one, to my knowledge, questions the safety of the dam." He went on to say that even if a catastrophic dam failure was to occur, "[t]he only issue is how many of the parking spaces in this development get wet because no one who's actually buying cereal on aisle 13 at Kroger is going to get their shoes damp." He stated that even under the worst case scenario, "the buildings don't get wet." The attorney claimed that the dam issue was "purely and simply an engineering and insurance issue for the developer which they are addressing." Commissioner Verschuur responded by stating that the dam issue was "not all sunshine and roses," as he was aware of a "notice of noncompliance of the

Safe Dam Act being issued" and issues regarding whether the dam was being properly maintained. The "Dam Breach Analysis" that Petitioner submitted to the Board of Commissioners with its application consists of a single page displaying some type of diagram with no explanation of its meaning. At the meeting before the Board of Commissioners, a civil engineer addressed the Board and stated that two previous dam breach studies had been completed, but that both of the studies were "solely owned, private and proprietary information" of the engineer's client "for internal, non-public evaluation and study purposes." The significance of this testimony is not clear from the record. It is not clear whether Petitioner was relying upon these studies or whether it had conducted independent studies. In any event, the Municipal Planning Commission found that "[t]he information for the Garner Lake Dam Breach area was not fully detailed or sufficient." We conclude that the concerns regarding the insufficiency of the information about the dam breach area constitute substantial and material evidence to support the Board's decision to deny Petitioner's application. Commissioner's Verschuur's comments do not indicate that he, or any other member of the Board, acted arbitrarily or illegally in voting to deny the application.[6]

Finally, comments were made by Commissioner Nicholson. He mentioned pleasing the citizens, but he also said that there were valid points on both sides of the issue. He further stated that Lakeland was a unique city and that he was a proponent of "planned development growth." Commissioner Nicholson said he felt that the development was premature, explaining, "I think we will ultimately develop there as a commercial development. But at this time the way they are structuring it, I don't think it's in the best interest of the citizens. I think there's a lot of factors the developers are sliding over that would play into how Highway 70 develops." He also stated that the development was "not structured the way it should be structured for that particular site." Nothing in Mr. Nicholson's statements suggests that he acted arbitrarily or illegally. Petitioner argues on appeal that there was no evidence to suggest that the development was premature, and that Commissioner Nicholson overlooked its "market study" that determined that Lakeland Commons would be very successful and appropriate at its proposed location. However, an Addendum to the city planning department's report expressed concern that Petitioner's market study "[did] not provide an overall rationale that clearly indicates why a large retail facility should be p[l]aced in the central area of Lakeland in the very near term." The

---

[6] Commissioner Verschuur made other comments as well. He stated that he had served on the committee that originally updated the Land Use Plan, and that he understood that one of the goals of a residential support center was to support the commercial needs of a neighborhood while minimizing traffic and avoiding "big box" stores. Commissioner Verschuur noted that Petitioner's proposal was projected to "draw people from all over the place," and he said that the development was a "profound contradiction" to his understanding of a residential support center.

Addendum stated that traffic counts were not available in any recent city studies, but that the figures used in Petitioner's market study were "lower than many retailers often require for a center of the size proposed." The Addendum stated that, in the future, traffic levels may reach the level that retailers generally desire, "but this may not occur for a number of years." It also mentioned that the city had conducted its own market analysis in 2007 and concluded that there was not a critical immediate need for another grocery store in Lakeland, although there might be "within several years." In conclusion, the Addendum stated that "[t]raffic counts seem to be a concern for the viability of a center of this size," and the city staff was "concerned that the size of this center may not be supportable in the near term[.]" Thus, Petitioner's assertion that Commissioner Nicholson's statement was without support is incorrect.

In sum, we reiterate that we cannot reweigh the evidence or scrutinize the intrinsic correctness of the Board's decision. *Lafferty*, 46 S.W.3d at 759. Instead, we "review the record independently to determine whether it contains 'such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion.'" *Id.* (quoting *Hedgepath*, 839 S.W.2d at 421). "If 'any possible reason' exists justifying the action, it will be upheld." *McCallen*, 786 S.W.2d at 641. From our review of the record, there is more than one valid "possible reason" to justify the Board's decision to deny Petitioner's application in this case. We cannot simply substitute our judgment for that of the Board of Commissioners.

## IV.   CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to the appellant, Lakeland Commons, LP, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.