FILED
09/26/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 13, 2019 Session

## PMFS H-VIEW I, LLC v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY ET AL.

Appeal from the Chancery Court for Davidson County
No. 17-1177-III     Ellen H. Lyle, Chancellor
_____

No. M2018-01806-COA-R3-CV
_____

This appeal concerns a municipality's authority to order structures demolished pursuant to the Slum Clearance and Redevelopment Act, Tenn. Code Ann. § 13-21-101 *et seq.*, and local ordinances implementing that Act. The trial court vacated a decision of the Metropolitan Board of Property Standards and Appeals that required demolition of the structures at issue. In light of the evidence that the cost to repair the structures exceeds fifty percent of their value, we reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

J. Brooks Fox and Catherine J. Pham, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County

R. Mark Donnell, Jr., Nashville, Tennessee, for the appellee, PMFS H-View I, LLC.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

The Appellee PMFS H-View I, LLC ("PMFS") is the owner of a vacant apartment complex located at 4301 Hermitage Road ("the Property"). Although there were existing tenants when PMFS acquired the Property in September 2007, the structures on the Property have since been vacant for over a decade. In 2017, the Davidson County Assessor of Property valued the structures at $33,600.00.

The present dispute stems from an inspection of the Property that occurred in May 2017. Following this inspection, PMFS was sent a letter by the Metropolitan Government of Nashville and Davidson County ("Metro"), wherein William Penn, the Assistant Director of the Property Standards Division, wrote as follows:

> A preliminary investigation was made by a Metropolitan Property Standards Inspector in accordance with the provisions of the Metropolitan Property Standards Code enacted by the Metropolitan Council as Ordinance No. BL-2001-585. The investigation made on May 2, 2017, revealed that the structure located thereon appears to be unfit for human habitation . . . . The Metropolitan Property Standards Inspector who investigated your property has prepared an inspection report and it is requested that you appear for a hearing before the Director or his designated agent regarding this report at 8:30 a.m. on June 27, 2017, in the Metro Office Building, 800 2nd Avenue, South, 3rd Floor. You and/or parties in interest may file an answer to this complaint and you may appear in person, or otherwise, to offer your testimony or the testimony of your witnesses in opposition to the inspector's report at the above mentioned time and date.

Pursuant to the attached inspection reports for the structures, which recommended demolition, it was noted that the cost to repair the structures would be in excess of 50% of the assessed value. In pertinent part, the reports outlined as follows:

> The extent of the damage and / or deterioration of the structure(s) render the structure(s) unfit for human habitation. The severity of the condition of this property is such that the repairs necessary to bring this property into compliance with applicable codes would exceed fifty percent of the structures value qualifying this property for demolition. And in the case of this property(s), the damage / destruction of the structure(s) exceeds 75%, rendering the restoration of the structure(s) impractical.

Although a demolition order would subsequently issue on June 27, 2017 upon the basis of the findings in the inspection reports,[1] PMFS appealed the matter to the Metropolitan Board of Property Standards and Appeals ("the Board"). A hearing before the Board was scheduled for September 6, 2017, and in advance of the hearing, counsel for PMFS tendered a letter to the Board indicating that PMFS did not seek to repair the buildings on the Property, albeit while still opposing the order to demolish.

---

[1] The demolition order found, among other things, that the conditions of the structures were "inimical to the general welfare of the residents and property owners of Metropolitan Nashville and Davidson County."

The hearing before the Board eventually occurred as scheduled, and, upon the conclusion of the proceedings, the Board voted to uphold the demolition order. The present litigation was then commenced on November 1, 2017, when PMFS filed a petition for writ of certiorari in the Davidson County Chancery Court. In its petition, PMFS requested that the Chancery Court direct the Board to vacate the demolition order.

A writ of certiorari was promptly issued by the Chancery Court upon the filing of the petition, and thereafter, on April 27, 2018, the administrative record was filed. The matter was heard by the Chancery Court in a hearing on August 2, 2018. In a subsequent order entered on August 30, 2018, the Chancery Court granted relief in favor of PMFS and vacated the demolition order, stating in relevant part as follows:

> [T]he Demolition Order does not analyze whether the vacant structure on the Property could be repaired to be safe for a **vacant** building, a different, potentially less costly fix to make, but instead analyzes the cost to repair the Property to the high standard of fit for human habitation resulting in the Demolition Order concluding that demolition is necessary because the cost to bring the Property to be fit for human habitation is impractical.

(emphasis in original) Despite vacating the demolition order, the Chancery Court stated that its ruling was without prejudice to the Board to reassign the matter to the Codes Department to apply what was, in the court's view, the correct standard. This appeal followed upon the filing of a notice of appeal by Metro.

**STANDARD OF REVIEW**

A common law writ of certiorari provides limited judicial review. *421 Corp. v. Metro. Gov't of Nashville & Davidson Cty.*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000). "The scope of review by the appellate courts is no broader or more comprehensive than that of the trial court." *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980). The scope of review "goes no further than determining whether the administrative body 'exceeded its jurisdiction; followed an unlawful procedure; acted illegally, arbitrarily, or fraudulently; or acted without material evidence to support its decision.'" *Levitt v. City of Oak Ridge*, No. E2011-02732-COA-R3-CV, 2012 WL 5328248, at *2 (Tenn. Ct. App. Oct. 30, 2012) (quoting *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758-59 (Tenn. Ct. App. 2000)).

**DISCUSSION**

Here, Metro challenges the Chancery Court's conclusion that the Board's decision should be vacated. In relevant part, Metro argues that the proposed demolition of the structures on the Property is supported by the Slum Clearance and Redevelopment Act,

Tenn. Code Ann. § 13-21-101 *et seq.*, and the local ordinances adopted pursuant to it. For the reasons that follow, we agree.

As this Court has noted in the past, Tennessee's Slum Clearance and Redevelopment Act

> confers upon municipalities the power "to exercise its police powers to repair, close or demolish" structures that are unfit for human occupation or use. Tenn. Code Ann. §13-21-102(a). It authorizes municipalities to adopt ordinances relating to the structures within the municipality that are unfit for human occupation or use. Tenn. Code Ann. § 13-21-103. The municipality is directed to designate or appoint a public officer to exercise the powers prescribed by the ordinances. Tenn. Code Ann. § 13-21-103(1). The Act provides that the designated public officer can serve complaints, hold hearings, and determine structures to be unfit for human occupation and use . . . . Tenn. Code Ann. § 13-21-103(2), (3).
>
> By passing the Slum Clearance and Redevelopment Act, "the legislature provided a method for municipalities to order the demolition of a building found unfit for human habitation." *Manning v. City of Lebanon*, 124 S.W.3d 562, 565 (Tenn. Ct. App. 2003) (citing *Winters v. Sawyer*, 225 Tenn. 113, 463 S.W.2d 705 (1971)).

*City of Jackson v. Walker*, No. W2015-00621-COA-R3-CV, 2016 WL 384999, at *3 (Tenn. Ct. App. Feb. 2, 2016).

Under the pertinent statutory scheme, once a structure is determined to be unfit for human occupation or use, its potential fate is dependent on the cost required to repair, alter, or improve it. Indeed, Tennessee Code Annotated section 13-21-103(3) specifically provides as follows:

> (3) If, after such notice and hearing, the public officer determines that the structure under consideration is unfit for human occupation or use, the public officer shall state in writing the public officer's findings of fact in support of such determination and shall issue and cause to be served upon the owner thereof an order:
>
> (A) If the repair, alteration or improvement of the structure can be made at a reasonable cost in relation to the value of the structure (the ordinance of the municipality may fix a certain percentage of such cost as being reasonable for such purpose), requiring the owner, within the time specified in the order, to repair, alter or improve such structure to render it fit for

human occupation or use or to vacate and close the structure as a place of human occupation or use; or

(B) If the repair, alteration or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure (the ordinance of the municipality may fix a certain percentage of such cost as being reasonable for such purpose), requiring the owner, within the time specified in the order, to remove or demolish such structure;

Tenn. Code Ann. § 13-21-103(3).

Pursuant to the municipal analog adopted by Metro, the relevant percentage fixed pursuant to this provision is 50%:

If, after such notice and hearing, as provided in Section 16.24.580, the director or the director's authorized agent determines that the dwelling or structure under consideration is unfit for human habitation, occupation, or use, the individual making the determination shall state in writing the findings of fact in support of such determination and shall issue and cause to be served upon the owner thereof an order:

1. **If the repair, alteration, or improvement of such dwelling, structure or accessory dwelling or structure can be made at a cost not to exceed fifty percent of the value of the dwelling or structure,** requiring the owner, within the time specified in the order, to repair, alter or improve such building or structure to render it fit for human habitation, occupation or use, or to vacate and close the building or structure as a place of human habitation, occupation or use. The order shall allow a reasonable time for the performance of any act it requires. For the purposes of this article, the value of the dwelling or structure shall be assumed to be that established by the tax assessor's office.

. . . .

2. **If the repair, alteration, or improvement of such dwelling, structure, or accessory dwelling or structure cannot be made at a cost not to exceed fifty percent of the value of the dwelling or structure**, requiring the owner within the time specified in the order to remove or demolish such dwelling or structure. For the purposes of this article, the value of the dwelling or structure shall be assumed to be that established by the tax assessor's office.

Metro Code § 16.24.590 (emphases added).  As is evident, upon a finding that a structure is unfit for human habitation, occupation, or use, an order shall issue requiring the owner to remove or demolish the structure if the cost to repair the structure would exceed fifty percent of the structure's value based on the value of the structure established by the tax assessor's office, i.e., the assessed value of the property.

Contrary to arguments made by PMFS on appeal, the Board's decision in this case was supported by the record before it.  Mr. Penn stated before the Board that the structures were a "blight" on the community and neighborhood, specifically noting that they were "in a very serious state of deterioration."  Moreover, the inspection reports for the Property, which are included in the administrative record, detail numerous violations of the Property Standards Code and include a corresponding finding that the structures are unfit for human habitation.  According to the reports, "[a]ll of the major systems, including structural, appear to have been affected and/or damaged due to neglect."  Further, the reports contain specific findings that the level of damage and destruction at the Property pose an "immediate hazard to the community."  These particular inspection assessments are themselves significant, as they provided the Board evidence that the structures are unfit for human habitation.  *See* Metro Code § 16.24.570 (emphasis added) ("Any dwelling or structure is unfit for human habitation, occupation, or use if conditions exist which, in the opinion of the director, are *dangerous or injurious to the health, safety, or morals of* the occupants of dwelling or structure, the occupants of neighboring buildings, structures, or premises, or *other residents of the metropolitan government area*.").  Critically, the inspection reports also contain a finding that "[t]he severity of the condition of this property is such that the repairs necessary to bring this property into compliance . . . would exceed fifty percent of the structures value qualifying this property for demolition."  In our view, therefore, the record, as well as the local ordinances implementing the Slum Clearance and Redevelopment Act, clearly furnished a basis upon which the Board could conclude that the structures on the Property should be demolished.

In holding that demolition was not supported, the Chancery Court first looked to the text of Metro Code § 16.24.590 to support its conclusion that "a long-term closed, vacated structure is . . . an alternative to dealing with a structure unfit for human habitation."  We have no quarrel with the premise that demolition is not automatically required for structures deemed unfit for human habitation.  The Metro Code does indicate that vacant structures are permissible, and the trial court rightfully acknowledged in its order that "vacate and close" is an option for structures under Metro Code § 16.24.590.  Yet, it must be emphasized that this "vacate and close" option for structures deemed unfit for human habitation, occupation, or use is specifically available when the cost to repair the structures does not exceed fifty percent of their value.  Again, in relevant portion, the Metro Code provides as follows:

If . . . the director or the director's authorized agent determines that the dwelling or structure under consideration is unfit for human habitation,

occupation, or use, the individual making the determination shall state in writing the findings of fact in support of such determination and shall issue and cause to be served upon the owner thereof an order:

1. **If the repair, alteration, or improvement of such dwelling, structure or accessory dwelling or structure can be made at a cost not to exceed fifty percent of the value of the dwelling or structure**, requiring the owner, within the time specified in the order, to repair, alter or improve such building or structure to render it fit for human habitation, occupation or use, **or to vacate and close the building or structure as a place of human habitation, occupation or use**.

Metro Code § 16.24.590 (emphases added). Here, of course, evidence in the administrative record indicated that the cost to repair the structures exceeded fifty percent of their value. Thus, the "vacate and close" option alluded to by the Chancery Court is inapplicable.

Despite its initial observations about the "vacate and close" option in Metro Code § 16.24.590, the Chancery Court later held in its order that the criteria of that Code section do not apply. According to the court, the relevant standard is found at Metro Code § 16.24.320 given that the structures at issue are not presently occupied. Under that provision, "[a]ll vacant buildings, structures, and the premises thereof, shall be maintained in a safe, clean, and sanitary condition as provided herein so as not to cause blight and or otherwise adversely affect the public health, safety, or welfare." Metro Code § 16.24.320.

We do not dispute that the Metro Code provides standards for vacant buildings, such as in Metro Code § 16.24.320, but we respectfully disagree with the Chancery Court that Metro Code § 16.24.590, which implements the Slum Clearance and Redevelopment Act, is inapplicable to this matter. The structures on the Property may presently be unoccupied, but this is of no moment. As Metro has pointed out, the definition of "structure" includes a vacant building, *see* Metro Code § 16.24.030; *see also* Tenn. Code Ann. § 13-21-101(9), and the Director of the Department of Codes Administration is specifically authorized to take action with respect to structures unfit for human habitation, occupation, or use. *See* Metro Code § 16.24.560. Indeed, as we have previously explained, the Slum Clearance and Redevelopment Act "confers upon municipalities the power 'to exercise its police powers to repair, close or demolish' structures that are unfit for human occupation or use." *Walker*, 2016 WL 384999, at *3 (quoting Tenn. Code Ann. § 13-21-102(a)).

In defense of the Chancery Court's action, PMFS offers, among other things, the following argument on appeal: "If 'alteration' of the structure to comply with the specific Code provisions that apply to vacant structures is possible at a cost not to exceed

fifty percent of its value, then the 'vacate and close' option provided in section 16.24.590(1) and (1)(b) should be available to the owner." Respectfully, we find no support for this position. It is true that a "vacate and close" option is available under Metro Code § 16.24.590. However, the specific formula advocated for by PMFS is non-existent. The fifty percent benchmark under Metro Code § 16.24.590 is in relation to making the property fit for human habitation, occupation, or use, not in relation to a generalized standard for vacant properties. *See* Metro Code § 16.24.590(1) (emphasis added) ("If the repair, alteration, or improvement of such dwelling, structure or accessory dwelling or structure **can be made at a cost not to exceed fifty percent of the value of the dwelling or structure**, requiring the owner, within the time specified in the order, **to repair, alter or improve such building or structure to render it fit for human habitation, occupation or use**, or to vacate and close the building or structure as a place of human habitation, occupation or use."). Again, in this case, it appears that there is only evidence that the cost to repair the structures exceeds fifty percent of their value.

To conclude, we hold that Metro had authority to take action regarding the Property pursuant to the Slum Clearance and Redevelopment Act. Further, because the evidence showed that the cost to repair the structures exceeded fifty percent of their value, the Board acted properly in ordering their demolition. *See* Metro Code § 16.24.590 (noting that an owner shall be required to remove or demolish a structure unfit for human habitation "[i]f the repair, alteration, or improvement of such dwelling, structure, or accessory dwelling or structure cannot be made at a cost not to exceed fifty percent of the value of the dwelling or structure"). The trial court's decision to vacate the Board's action is accordingly reversed.

## CONCLUSION

In light of the foregoing discussion, we hereby reverse the trial court's judgment and remand the case for the entry of an order reinstating the decision of the Board.

_____
ARNOLD B. GOLDIN, JUDGE