IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 17, 2019 Session

## JOE V. WILLIAMS v. DENNIS EPPERSON ET AL.

**Appeal from the Chancery Court for Bradley County
No. 2017-CV-306     Jerri S. Bryant, Chancellor**

### No. E2019-00319-COA-R3-CV

This case involves an appeal to the Bradley County Chancery Court ("trial court") of an administrative decision by the Building Board of Adjustment and Appeals for the City of Cleveland ("the Board") to uphold the City of Cleveland's chief building official's decision to condemn and order the demolition of a commercial building. Upon a notice of condemnation issued by the chief building official based on the allegedly dilapidated and unsafe condition of the building, the building's owner appealed to the Board. Following a hearing, the Board upheld the condemnation and demolition order. The owner then filed a petition for writ of certiorari with the trial court, requesting, *inter alia*, that the demolition order be vacated. Following a hearing, the trial court found that the Board's decision had been supported by substantial and material evidence and accordingly upheld the Board's affirmance of the condemnation and demolition order. The owner filed a motion to alter or amend the judgment, which the trial court denied. The owner timely appealed to this Court. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

James R. McKoon and McLean A. Stohler, Chattanooga, Tennessee, for the appellant, Joe V. Williams.

Stacy Lynn Archer, Philip Aaron Wells, and Ronald D. Wells, Chattanooga, Tennessee, for the appellees, Dennis Epperson, Donald Humes, Chris Lyles, Jim Williams, Dennis Norman, Lisa Stanbery, Chad Dean, Dustin Hawkins, each in his or her official capacity as a member of the Building Board of Adjustment and Appeals for the City of Cleveland, Tennessee; Bryan Turner, in his capacity as Chief Building Official of the City of Cleveland; and the City of Cleveland, Tennessee.

## OPINION

### I. Factual and Procedural Background

The petitioner, Joe V. Williams ("Petitioner"), is the owner of improved real property located at 80 Church Street, Northeast, in Cleveland, Tennessee ("the Property"). According to Petitioner, the building situated on the Property ("the Building") was constructed between 1900 and 1905 and had in the past, among other uses, served as the Tennessee National Guard Armory and as an office building for the State of Tennessee. This appeal arose from a "Notice of Condemnation No Repair Possible" issued by Bryan Turner, as the City of Cleveland's Chief Building Official ("Official Turner"), on August 30, 2017.

In the notice, Official Turner stated that "the commercial building is so dilapidated, and has become so out of repair as to be dangerous, unsafe, unsanitary or otherwise unfit for human habitation or occupancy, to the extent that it is unreasonable to repair the structure." The notice included an order that "the structure must be demolished and removed by the end of business day October 31, 2017." It also included instructions for exercising a right to appeal the notice with the Board. Petitioner timely appealed to the Board.

The Board conducted a hearing on October 3, 2017, during which Petitioner testified and presented, *inter alia*, a "Structural Report" that had been completed by a structural engineer with A G Engineering, LLC, on September 25, 2017. The report delineated "measures necessary for rehabilitation of the building" that needed to be completed on the foundation, main floor, second floor, and roof. The structural engineer concluded the report by stating: "The building will be structurally inhabitable when decayed wood structural floor elements are removed and replaced and proper drainage is established. Door and window openings must be functional and capable of being sealed."

On October 12, 2017, the Board issued a ruling upholding Official Turner's decision to condemn the Building with no repair possible and order its demolition. As criteria for the decision, both Official Turner in the notice of condemnation and the Board in its ruling cited City of Cleveland Municipal Code ("Municipal Code") § 13-305(2), which provides in pertinent part that "[i]f the repair, alteration or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure (not to exceed fifty percent [50%] of the value of the premises)," an order may be issued "requiring the owner, within the time specified in the order, to remove or demolish such structure."

In its ruling, the Board found the following with respect to the background of the Property:

> The property was initially inspected by Codes Enforcement Officer Allen Johnson on 8/5/2015 who gave notice to [Petitioner] on 8/25/2015. City of Cleveland Fire Inspector Mika Vaughn, during a routine annual fire inspection, in or around 2/9/2016, established concerns for the structural integrity and fire loading of the building and it was then submitted to [Official Turner]. A case regarding the building was established by [Official Turner] on 3/7/2016. The condition of the property was documented through photographs.

> Upon investigation, [Official Turner] reviewed the findings and determined that the structural stability of the building was in question and met with [Petitioner] on 3/15/2016, to discuss his plan of action. It was determined, at this time, the building would be designated Condemned with Repair Possible.

> After a year of continued non-compliance with established goals in regard to the adopted building code and procedures, Citation 00251 was issued to Municipal Court on 3/2/2017, resulting in multiple court dates through 9/21/2017.

> On 8/16/2017, a pane of glass fell from the 2nd story of the building onto the public sidewalk. This prompted [Official Turner] to close the sidewalk in front of the building and re-examine the condemnation status. At this time, it was [Official Turner's] determination the building constituted a threat to public safety, the status changed to Condemnation with No Repair Possible, and [Petitioner] was given notice of 10 days to begin work in earnest to stabilize the structure.

> On 08/30/2017, after non-compliance with the notice of 8/16/2016, a Notice of Condemnation with No Repair Possible, requiring demolition, was served on [Petitioner].

> On 9/17/2017, [Official Turner] was alerted the side door to the building was laying on the sidewalk and the building was unsecured. [Official Turner], with assistance from Public Works, put the door back in place and secured the door to the frame. [Official Turner] determined the facades of the building were unstable and the condition of the building was dangerous. [Petitioner] was given notice.

3

On 9/21/2017, [City of Cleveland Municipal Court] Judge Barret Painter was updated that the status of the building had changed to Condemnation with No Repair Possible which would continue under a new administrative process of which [Petitioner] could appeal through an established procedure for that designation. Citation 00251 was closed and a remedial fine for continued non-compliance was imposed of $4,850.00, plus court costs.

(Internal citations to record omitted.)

The above facts, as summarized in the Board's findings, are essentially undisputed except that concerning the year of what the Board termed "continued non-compliance" from March 2016 to March 2017, Petitioner maintained before the Board that he had made several attempts to comply with established goals for repair of the Building. During the Board hearing, Petitioner presented an invoice dated August 11, 2017, from his contractor, Raines Brothers, Inc. ("Raines Brothers"), in the amount of $53,818.26 for repairs purportedly completed to the Building. Petitioner acknowledged, however, that he had retained Raines Brothers to work on other projects as well and that a delay in another project had delayed work on the Building. Official Turner's records, also presented to the Board, reflected that when Petitioner appeared before the Cleveland Municipal Court in July 2017, a representative from Raines Brothers also appeared and stated that Raines Brothers would not complete work on the Building until it had been paid by Petitioner for work already completed. During the Board hearing, Petitioner stated that the delay in payment to Raines Brothers was due to a delay in obtaining a loan and that he had since paid Raines Brothers in full. He acknowledged, however, that the roofing repairs on the Building had not yet been completed.

In concluding that Official Turner's decision should be upheld, the Board found in its ruling:

Members of the board assert that the engineer's report provided by [Petitioner] during the meeting would indicate the building is structurally unsound, and the costs to repair would exceed 50% of the value of the structure. The applicant was given substantial time to repair the building and failed to do so over the course of two years, as indicated by the case notes.

(Internal citation to record omitted.)

4

As to the Property's value, it is undisputed that when Official Turner sent notice to Petitioner on August 17, 2017, concerning the pane of glass that had fallen and ordered that "work must begin in earnest to stabilize the structure of the building within 10 days," he attached an "Unofficial Property Report Card" for the Property that included a "Current Property Assessment." This property assessment reflected a Building value of $60,900.00 and land value of $39,600.00, for a total valuation of the Property at $101,000.00.[1] It is undisputed that this property assessment was originally completed for the purposes of determining property tax ("Tax Assessment").

During the Board hearing, Petitioner testified that the Property should be valued at approximately $400,000.00 based on his assertion that "[t]he market value in downtown Cleveland [was] running between $30 and $40 dollars per [square foot]." The undisputed square footage of the Building was 9,440. As the trial court noted in its final order, the Property would have a reasonable market value of $377,600.00 at the upper end of Petitioner's estimate of $40.00 per square foot. Petitioner testified that he had been given an estimate for the cost of needed structural repairs to the Building in the amount of $200,000.00 but that he believed the cost of repairs could be as low as $150,000.00.

On October 3, 2017, Petitioner filed a petition for writ of certiorari in the trial court, naming as respondents Official Turner; the City of Cleveland; and Dennis Epperson, Donald Humes, Chris Lyles, Jim Williams, Dennis Norman, Lisa Stanbery, Chad Dean, and Dustin Hawkins "each in their official capacity as members of [the Board]" (collectively, "Respondents"). Petitioner requested, *inter alia*, that the trial court vacate the Board's ruling upholding Official Turner's order to demolish the Building.[2] Petitioner also sought a temporary restraining order or injunction to prevent the demolition of the Building during the proceedings. The trial court entered two successive temporary restraining orders and ultimately an "Extended Restraining Order," entered on April 16, 2018, restraining Respondents from "razing or demolishing the property at issue in this matter, including any structures thereon, or attempting to enforce its prior

---

[1] We note that the total value of the Property, as stated in the Tax Assessment, represents a rounding up to $101,000.00 from $100,500.00.

[2] In addition, Petitioner claimed violation of his due process rights and property rights under the United States and Tennessee Constitutions. Pursuant to his federal constitutional claims, Petitioner requested a jury trial and attorney's fees pursuant to 42 United States Code § 1988. In an agreed order entered on December 13, 2017, the trial court dismissed Petitioner's federal constitutional claims without prejudice, noting that the parties were at that time engaged in settlement negotiations and that the window of time for Respondents to file a notice of removal to federal court was closing. Although in the agreed order the trial court expressly gave Petitioner permission "[s]hould settlement negotiations between the parties cease" to "amend his Petition to reassert his claim for violation of due process pursuant to the Fifth and Fourteenth Amendments of the United States Constitution," no amended petition appears in the record.

5

condemnation order so as to require Petitioner to raze or demolish the property until further Order of this Court."

In response to the petition for writ of certiorari, Respondents filed a motion on June 14, 2018, requesting that the trial court either set the matter for hearing or issue a ruling based on the administrative record. Respondents attached to their motion a brief and additional exhibits from the administrative record. In their brief, Respondents asserted that the Board's decision had not been "arbitrary, capricious or illegal" and that "[t]he record contains substantial and material evidence that the cost of repairs was disproportionate to the building's value under [Municipal Code] Section 13-305." Respondents also asserted that "the Board's consideration of [Petitioner's] lack of diligence in undertaking structural repairs in the two years preceding the issuance of the demolition order was proper, as the building poses a threat to public health and safety." Respondents requested that the trial court deny Petitioner's request for a continued injunction because "the building in its current state, and at the time of the hearing before the Board, constitutes a threat to public health and safety."

Following a hearing conducted on August 29, 2018, the trial court entered an order on October 10, 2018, upholding the Board's decision and denying Petitioner's request for an injunction. The trial court found the factual background preceding the issuance of the notice of condemnation without possibility of repair to be essentially as the Board had found. In dismissing the appeal, the trial court concluded in pertinent part:

> After review of the transcript of the proceeding in this record, as well as the pleadings and attachments, the Court finds there is material evidence to support the [Board's] decision. This Court finds the record contains substantial and material evidence to support the Board's decision to uphold the notice of condemnation no repair possible by order of [Official] Turner on or about August 30, 2017 (the demolition order). The Court does not find the demolition order was arbitrary, capricious, or illegal and the injunction requested by Petitioner is hereby DENIED.
>
> * * *
>
> According to the 2017 tax assessment for the property, the value of the building was $60,900 which when added to the value of the land indicated a total assessed value of $101,000. Petitioner admitted during the hearing the cost to restore the structural integrity of the building would be between $150,000 and $200,000. Based on the fact that Petitioner had been given over two (2) years to remedy the defects in this building and Petitioner remaining non-compliant, and upon the reliance of the engineer reports

6

provided by Petitioner at the October 3, 2017 hearing and the estimated costs of the repair would exceed 50% of the value of the structure, the Board upheld the demolition order.

Petitioner filed a timely Tennessee Rule of Civil Procedure 59.04 motion to alter or amend the judgment, arguing that the trial court had erred by (1) upholding the Board's consideration of delays in Petitioner's repairs to the Property, (2) upholding the Board's consideration of the Tax Assessment as evidence of the Property's value, (3) declining to consider the Board's unwillingness to accept Petitioner's testimony as to the value of the Property, and (4) declining to consider the Board's purported willingness to sell the Property to a third party. Respondents filed a response objecting to the motion to alter or amend.

Following a hearing, the trial court entered an order on January 16, 2019, confirming its affirmance of the Board's decision but granting Petitioner's motion to alter or amend insofar as the trial court clarified some elements of what had occurred during the Board hearing. Specifically, the trial court clarified, *inter alia*, that Respondents had "concede[d] that Petitioner was not prosecuted under any ordinance other than the basis of the cost to repair." As to the evidence of the Property's value, the trial court noted that the Tax Assessment "was part of the notice given to Petitioner" and had "not [been] objected to at the hearing" and that "Petitioner came in with his own opinion that the value of the property was $377,600 and the cost of repair was up to $200,000." The trial court again concluded that there was "material evidence in the record to support the decision of the [Board]." Petitioner timely appealed to this Court.

## II. Issues Presented

Petitioner presents four evidentiary sub-issues within what we determine to be the overarching, dispositive issue, which we have restated as follows:

> Whether the trial court erred by determining that the Board's decision to uphold the demolition order was supported by substantial and material evidence.

We restate and reorder the evidentiary sub-issues raised by Petitioner as follows:

A. Whether the trial court erred by considering evidence regarding Petitioner's delays in repairing the Building as a basis to authorize demolition under Municipal Code § 13-305.

B.      Whether the trial court erred by declining to find that the Board had erred by considering the Tax Assessment as evidence of the Property's value.

C.      Whether the trial court erred by declining to find that that the Board had failed to properly consider Petitioner's testimony as to the value of the Property.

D.      Whether the trial court erred by declining to find that the Board's consideration of allowing a third-party successor owner to repair the Building was evidence that the cost of repairing the Building did not exceed fifty percent of the Property's value, thereby rendering the Board's affirmance of the condemnation to be arbitrary and capricious.

## III. Standard of Review

Petitioner is appealing the trial court's affirmance of the Board's decision to uphold Official Turner's condemnation of and order to demolish the Building. The trial court properly reviewed the Board's decision according to the standard for common law writ of certiorari. As this Court has explained:

> Once a structure has been declared unfit for human occupation or use, an owner may seek judicial review of the Board's decision by filing a petition for common law writ of certiorari. *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990). A common law writ of certiorari provides quite limited judicial review. *Willis v. Tennessee Dep't of Corr.*, 113 S.W.3d 706, 712 (Tenn. 2003). The scope of this review goes no further than determining whether the administrative body "exceeded its jurisdiction; followed an unlawful procedure; acted illegally, arbitrarily, or fraudulently; or acted without material evidence to support its decision." *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758-59 (Tenn. Ct. App. 2000) (citations omitted).

*Levitt v. City of Oak Ridge*, No. E2011-02732-COA-R3-CV, 2012 WL 5328248, at *2 (Tenn. Ct. App. Oct. 30, 2012).

An issue concerning the evidentiary foundation of an administrative board's decision presents a question of law. *Gulley v. Robertson Cty. Planning & Zoning Comm'n*, No. M2015-00734-COA-R3-CV, 2016 WL 2898478, at *2 (Tenn. Ct. App.

8

May 12, 2016) (citing *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (Tenn. Ct. App. 2000)). Concerning the applicable material evidence standard, this Court has explained:

> "[M]aterial evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992). The amount of material evidence required to support an agency's decision "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co.* [v. *Metro. Gov't of Nashville & Davidson Cty.*], 213 S.W.3d [898,] 904 [(Tenn. Ct. App. 2006)]. Because the sufficiency of the material evidence in a common law writ of certiorari proceeding is a question of law, the courts must review the record de novo without presuming that the findings are correct. *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (Tenn. Ct. App. 2000).

*Kaplow v. City of Gatlinburg Bd. of Adjustments & Appeals*, No. E2014-00347-COA-R3-CV, 2015 WL 3964212, at *4 (Tenn. Ct. App. June 30, 2015).

This case requires us to interpret the language of a municipal ordinance. "Interpreting statutes, procedural rules, and local ordinances involves questions of law, which appellate courts review de novo without a presumption of correctness." *City of Jackson v. Walker*, No. W2015-00621-COA-R3-CV, 2016 WL 384999, at *2 (Tenn. Ct. App. Feb. 2, 2016) (citing *Shore v. Maple Lane Farms, LLC,* 411 S.W.3d 405, 414 (Tenn. 2013)). Our Supreme Court has summarized the principles involved in statutory construction as follows:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a

statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009).

## IV. Affirmance of Demolition Order

In amending its final order, the trial court noted the Board's concession that it had not sought the condemnation and demolition of the Building "under any ordinance other than the basis of the cost to repair." Petitioner asserts that in affirming Official Turner's decision concerning the Building, the Board, and in turn the trial court, erroneously considered Petitioner's delays in repairing the Building rather than confining the basis for its ruling to the value of and the cost to repair the Building. Upon careful review, we determine that regardless of whether the Board considered Petitioner's delays in repairing the Building, the totality of the evidence presented concerning value and cost of repair, including the evidence presented by Petitioner, demonstrated that the cost of repairing the Building would have been greater than 50% of the Property's value. Therefore, pursuant to Municipal Code § 13-305, the Board's decision to uphold the Building's condemnation was not arbitrary or capricious because it was supported by substantial and material evidence concerning value and cost of repair.

Municipal Code § 13-305, as it was quoted by Official Turner in notices to Petitioner, in the Board's ruling, and in Respondents' pleadings before the trial court, provides the following for the basis of a repair, alteration, improvement, or demolition order:

> (1)    If the repair, alteration or improvement of the structure can be made at a reasonable cost in relation to the value of the structure (not exceeding fifty percent [50%] of the reasonable value), requiring the owner, during the time specified in the order, to repair, alter, or improve such structure to render it fit for human occupancy or use or to vacate and close the structure as a place of human occupancy or use; or

(2)    If the repair, alteration or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure (not to exceed fifty percent [50%] of the value of the premises), requiring the owner, within the time specified in the order, to remove or demolish such structure.

At the outset, we note that no copy of the Municipal Code is included in the record and that we must therefore confine our application of the Municipal Code to § 13-305 as it appears in the record. *See* Tenn. R. Evid. 202(b) (providing that optional judicial notice of law may be taken of municipal ordinances only upon a party's request and reasonable notice to adverse parties); *411 P'ship v. Knox Cty.*, 372 S.W.3d 582, 587-88 (Tenn. Ct. App. 2011). We also note that the substantive language of Municipal Code § 13-305 mirrors that of Tennessee Code Annotated § 13-21-103(3) (2019), codified as part of Tennessee's Slum Clearance and Redevelopment Act ("SCRA"). *See* Tenn. Code Ann. § 13-21-101 (2019) *et seq.* Regarding the SCRA, this Court has recently explained:

> As this Court has noted in the past, Tennessee's Slum Clearance and Redevelopment Act
>
>> confers upon municipalities the power "to exercise its police powers to repair, close or demolish" structures that are unfit for human occupation or use. Tenn. Code Ann. § 13-21-102(a). It authorizes municipalities to adopt ordinances relating to the structures within the municipality that are unfit for human occupation or use. Tenn. Code Ann. § 13-21-103. The municipality is directed to designate or appoint a public officer to exercise the powers prescribed by the ordinances. Tenn. Code Ann. § 13-21-103(1). The Act provides that the designated public officer can serve complaints, hold hearings, and determine structures to be unfit for human occupation and use . . . . Tenn. Code Ann. § 13-21-103(2), (3).
>>
>> By passing the Slum Clearance and Redevelopment Act, "the legislature provided a method for municipalities to order the demolition of a building found unfit for human habitation." *Manning v. City of Lebanon*, 124 S.W.3d 562, 565 (Tenn. Ct. App. 2003) (citing *Winters v. Sawyer*, 225 Tenn. 113, 463 S.W.2d 705 (1971)).
>
> *City of Jackson v. Walker*, No. W2015-00621-COA-R3-CV, 2016 WL 384999, at *3 (Tenn. Ct. App. Feb. 2, 2016).

11

Under the pertinent statutory scheme, once a structure is determined to be unfit for human occupation or use, its potential fate is dependent on the cost required to repair, alter, or improve it. Indeed, Tennessee Code Annotated section 13-21-103(3) specifically provides as follows:

> (3)     If, after such notice and hearing, the public officer determines that the structure under consideration is unfit for human occupation or use, the public officer shall state in writing the public officer's findings of fact in support of such determination and shall issue and cause to be served upon the owner thereof an order:
>
> > (A)     If the repair, alteration or improvement of the structure can be made at a reasonable cost in relation to the value of the structure (the ordinance of the municipality may fix a certain percentage of such cost as being reasonable for such purpose), requiring the owner, within the time specified in the order, to repair, alter or improve such structure to render it fit for human occupation or use or to vacate and close the structure as a place of human occupation or use; or
> >
> > (B)     If the repair, alteration or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure (the ordinance of the municipality may fix a certain percentage of such cost as being reasonable for such purpose), requiring the owner, within the time specified in the order, to remove or demolish such structure[.]

Tenn. Code Ann. § 13-21-103(3).

*PMFS H-View I, LLC v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2018-01806-COA-R3-CV, 2019 WL 4727302, at *2-3 (Tenn. Ct. App. Sept. 26, 2019) (emphasis added). As the analog to Tennessee Code Annotated § 13-21-103(3)(B), Municipal Code § 13-305(2) fixes the relevant percentage as "not to exceed fifty percent [50%] of the

value of the premises." *See, e.g.*, *PMFS H-View I*, 2019 WL 4727302, at \*3 (noting that in a case involving the "municipal analog adopted by Metro [Government of Nashville and Davidson County], the relevant percentage fixed pursuant to this [statutory] provision is 50%" of the structure's value).

Petitioner takes issue with Respondents' partial reliance on appeal on the SCRA as an explanation of the "police power" employed by the City of Cleveland, through Official Turner and the Board, in condemning and ordering the demolition of the Building. Tennessee Code Annotated § 13-21-102(a) (2019) provides in full:

> Whenever any municipality of this state finds that there exists in such municipality structures which are unfit for human occupation or use due to dilapidation, defects increasing the hazards of fire, accident or other calamities, lack of ventilation, light or sanitary facilities, or due to other conditions rendering such structures unsafe or unsanitary, or dangerous or detrimental to the health, safety or morals, or otherwise inimical to the welfare of the residents of such municipality, power is hereby conferred upon such municipality to exercise its police powers to repair, close or demolish the aforementioned structure in the manner herein provided.

In contrast to municipal ordinances, we take mandatory judicial notice of the SCRA as the state statutory scheme enabling municipalities to enact ordinances exercising their "police powers to repair, close or demolish" structures that are "unfit for human occupation or use." *See id.*; *see also* Tenn. R. Evid. 202(a) (providing that courts shall take mandatory judicial notice of, *inter alia*, "the constitutions and statutes of the United States and of every state, territory, and other jurisdiction of the United States"). Contrary to Petitioner's assertion, we do not find that by citing to this enabling statute as the General Assembly's authorization for Municipal Code § 13-305, Respondents have improperly raised an argument not raised before the trial court.

In its written ruling upholding Official Turner's decision, the Board concluded:

> Members of the board assert that the engineer's report provided by [Petitioner] during the meeting would indicate the building is structurally unsound, and the costs to repair would exceed 50% of the value of the structure. The applicant was given substantial time to repair the building and failed to do so over the course of two years, as indicated by the case notes.

(Internal citation to record omitted.) In upholding the Board's decision, the trial court initially concluded in its October 18, 2018 order:

13

According to the 2017 tax assessment for the property, the value of the building was $60,900 which when added to the value of the land indicated a total assessed value of $101.000. Petitioner admitted during the hearing the cost to restore the structural integrity of the building would be between $150,000 and $200,000. Based on the fact that Petitioner had been given over two (2) years to remedy the defects in this building and Petitioner remaining non-compliant, and upon the reliance of the engineer reports provided by Petitioner at the October 3, 2017 hearing and the estimated costs of the repair would exceed 50% of the value of the structure, the Board upheld the demolition order.

In subsequently confirming its affirmance of the Board's decision upon Petitioner's motion to alter or amend, the trial court clarified in its final order:

[Respondents] concede[] that Petitioner was not prosecuted under any ordinance other than the basis of the cost to repair. They further concede that Exhibit 12, the tax assessment, was part of the notice given to Petitioner. It was not objected to at the hearing. Petitioner came in with his own opinion that the value of the property was $377,600 and the cost of repair was up to $200,000. Additionally, the Board relied on photos presented by [Respondents] to come to its own conclusion. This is information that supports the Board's decision that the cost to repair is more than 50% of the value of the structure. This is material evidence in the record to support the decision of the [Board].

We determine that although the trial court noted the Board's findings that Petitioner had delayed in repairing the Building, the trial court ultimately concluded that the Board's finding that the cost to repair the Building was more than 50% of its value was aligned with the Board's prosecution of the action under Municipal Code § 13-305. We therefore determine Petitioner's argument that the Board and the trial court impermissibly considered Petitioner's delays in repairing the Building to be unavailing. The dispositive issue before this Court is whether the trial court properly determined that the Board's finding as to the cost of repair versus value was supported by substantial and material evidence.

We begin our analysis of the evidence concerning cost of repair versus value by noting some confusion in the record regarding whether Municipal Code § 13-305(2) requires that the building code official's decision to condemn and order demolition of a structure be based on the cost of repair not exceeding 50% of the reasonable value of the structure (here, the Building) or of the "premises." In his pleadings before the trial court

14

and in his appellate brief, Petitioner has cited the relevant parenthetical explanation in § 13-305(2) as stating, "not exceeding fifty percent [50%] of the reasonable value" of the structure, rather than "not to exceed fifty percent [50%] of the value of the premises" as the subsection is quoted by Respondents in their pleadings. Again, we have not been provided with the original text of the Municipal Code. However, upon noting that Official Turner's original notices to Petitioner and the Board's ruling quoted the subsection as stating, "not to exceed fifty percent [50%] of the value of the premises," we will treat this as the official language of Municipal Code § 13-305(2) for purposes of this analysis.

Throughout their arguments on appeal, the parties have intermixed discussion of the Building's value with discussion of the Property's value. The SCRA defines a "structure" as "any dwelling or place of public accommodation or vacant building or structure suitable as a dwelling or place of public accommodation." Tenn. Code Ann. § 13-21-101(9). It is undisputed in this case that the "structure" at issue is the Building. However, the term, "premises," is not defined in the SCRA, and its definition has not been addressed by either party. As relevant to this situation, Black's Law Dictionary defines "premises" as "[a] house or building, along with its grounds." BLACK'S LAW DICTIONARY 1219 (8th ed. 2004). As a contrasting example, the comparable municipal code section at issue in *Harless v. City of Kingsport*, No. 03A01-9707-CH-00289, 1998 WL 131519, at *3 (Tenn. Ct. App. Mar. 25, 1998), expressly stated: "The building official shall determine the value of the structure in question existing on the land and the value of the land itself shall not be considered . . . ." (emphasis added). Applying the plain language of Municipal Code § 13-305(2) in this case, we determine that the value to be measured against the cost of repair of the Building is the value of the premises, or the Property as a whole. *See In re Estate of Tanner*, 295 S.W.3d at 614 ("When a statute is clear, we apply the plain meaning without complicating the task." (citing *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004))).

The Board in its ruling found that "the costs to repair [the Building] would exceed 50% of the value of the structure." However, the trial court, in both its October 18, 2018 order and amended final judgment, evaluated the evidence of valuation for the entire premises (the Property), as well as the Building, and determined that substantial and material evidence supported a finding that the cost to repair the Building would be more than 50% of the reasonable value of the Property. Although not raised by Petitioner as an issue on appeal, we find this discrepancy important to address in order to accurately analyze whether the Board, and in turn the trial court, properly applied Municipal Code § 13-305(2). As more fully explained below, because we determine that substantial and material evidence presented to the Board supported a finding that the cost to repair the Building would be more than 50% of the reasonable value of the premises, we determine the Board's statement in its ruling that the cost of repair would exceed 50% of the

15

Building's value, rather than the premises' value, to be harmless error. We further determine that the trial court properly applied Municipal Code § 13-305(2) to examine the evidence presented to the Board regarding the value of the premises.

Petitioner testified before the Board that he had been given an estimate by his contractor that the repairs needed to restore the structural integrity of the Building would cost approximately $200,000.00, although he also stated that he believed the actual amount needed could be closer to $150,000.00. In the structural report presented by Petitioner, the structural engineer stated the following:

> This report is to certify that I undertook first-hand visual inspection of the structure with the contractor to determine measures necessary for rehabilitation of the building.
>
> **FOUNDATION / MAIN FLOOR**
> The building is constructed over a crawl space. Decayed floor joists are evident. Damaged joists must be replaced to ensure long term satisfactory performance and safe occupancy. Installation of stud wall framing for support of floors will require placement of a footing alongside the inner building perimeter, as needed.
>
> **SECOND FLOOR**
> Significant structural decay and water damage is evident, particularly in the corners. New joists may be installed and supported by stud wall framing.
>
> **ROOF**
> An engineered truss system maintains the necessary pitch for adequate drainage. Structural re-decking and resurfacing in TPO has recently been undertaken.
>
> The building will be structurally inhabitable when decayed wood structural floor elements are removed and replaced and proper drainage is established. Door and window openings must be functional and capable of being sealed.

Petitioner also presented a structural evaluation of the Building's roof that had been completed by a consultant in February 2016, purportedly to establish the repairs that Petitioner had undertaken on the roof prior to the Board hearing. However, at the time of the Board hearing, Petitioner acknowledged that the repairs to the roof were not complete.

Along with the case history of the actions taken regarding the Building, Official Turner also presented photographs of the Building to the Board. While acknowledging that he was not a structural engineer, Official Turner testified as follows concerning the photographs and his observations of the Building:

> [A]s I look at it, there appears to be a lot of bowing in the structure. When you're looking at some of the front, there are some piers and everything that appears to bow out and I don't know if any of the pictures show it but, actually that back corner, uh yes, on page 18, that is that picture of that back corner where that door fell off. . . . [T]hat whole section is black due to water infiltration and this is after the roof has been replaced. It is just that it has not been completed. There was water dripping out in that metal header over the glass there on the day it rained and the door fell out in September, so obviously water intrusion is still a major issue. There's cracks in the stucco that go through the stucco into the actual brick wall itself, which is the structure, so there is obvious concern with the exterior wall stability.

The trial court found that in addition to Petitioner's testimony that the repairs needed to the Building would cost between $150,000.00 and $200,000.00, including the contractor's estimate of $200,000.00, the Board members had been able "to come to [their] own conclusion[s]" regarding the repairs needed based on the photographs presented by Official Turner. We determine that substantial and material evidence supported a finding that the cost of repairs to the Building would be in the upper end of the range acknowledged by Petitioner, or $200,000.00. *See, e.g., Hoover v. Metro. Bd. of Hous. Appeals of Metro. Gov't of Nashville & Davidson Cty.*, 936 S.W.2d 950, 954 (Tenn. Ct. App. 1996) ("The lists of necessary repairs and comprehensive pictorial illustrations are sufficient to satisfy a reasonable person of the cost of repairs in relation to the value of the property.").

The evidence before the Board regarding the value of the Property was twofold. First, during the Board hearing, Petitioner testified that "[t]he market value in downtown Cleveland [was] running between $30 and $40 dollars per [square foot]" and that some examples reflected a higher value. He asserted that estimating a value of $40.00 per square foot would yield a value of $400,000.00 for the Property. However, as the trial court ultimately found, considering the 9,440 square footage of the Building, the market value for the Property at Petitioner's estimate of $40.00 per square foot would have been $377,600.00. Petitioner did not differentiate in his estimate between the value of the Building and that of the Property, but given that he was referring to market value, he appeared to be referring to the potential market value of the Property as a whole.

17

Second, Official Turner's August 17, 2017 notice to Petitioner included the attached Tax Assessment. As the trial court noted, the August 17, 2017 notice, complete with the Tax Assessment, was before the Board as part of Official Turner's documentation of the Property's background. The Tax Assessment reflected a Building value of $60,900.00 and land value of $39,600.00, for a total assessed value of the Property at $101,000.00.

Petitioner contends that in weighing value against the cost of repair, the Board and the trial court erroneously considered the Tax Assessment as evidence of the Property's value while not crediting Petitioner's estimate of the Property's value. He argues that the Tax Assessment was not admissible as evidence of the Property's value. As a threshold matter, Respondents contend that Petitioner has waived this issue on appeal because he did not object to the Tax Assessment's admissibility during the Board hearing. In this situation, we disagree.

As Petitioner points out, although the Tax Assessment was before the Board as part of a set of documents presented by Official Turner and was undisputedly attached to the August 17, 2017 notice issued to Petitioner, the Tax Assessment was not referred to during the Board hearing by either Official Turner or any Board member. Moreover, as Respondents note, "[t]he strict rules of evidence applied by the courts are not necessarily applicable in hearings before administrative agencies." *Hoover*, 936 S.W.2d at 954 (citing 73-A C.J.S. Pub. Admin. Law & Procedure § 125 p. 28.). Although an evidentiary rule that is not invoked in an administrative proceeding may be regarded as waived, *see Hoover*, 936 S.W.2d at 954 (citing 73-A C.J.S. Pub. Admin. Law & Procedure § 125 p. 29 n.3), we do not find that Petitioner's failure to object to the Tax Assessment's inclusion in a set of documents not referred to during the hearing rises to the level of waiver of his issue concerning the Tax Assessment on appeal.

In support of his argument that the Tax Assessment was inadmissible as evidence of the Property's value, Petitioner relies on four state appellate decisions that involved eminent domain for the principle that tax assessments are not to be considered as evidence of property value in condemnation cases. *See Wray v. Knoxville, L.F. & J.R. Co.*, 82 S.W. 471, 475 (Tenn. 1904) ("It is said in Lewis on Eminent Domain, § 448, that the assessment of property for taxation being made for other purposes, and not at the instance of either party, and not usually at the market value of the property, is not admissible as evidence of value in condemnation proceedings."); *W. Tenn. Power & Light Co.* v. *Hughes*, 15 Tenn. App. 37, 40-41 (Tenn. Ct. App. 1932) (quoting *Wray*, 82 S.W. at 475); *Branham v. Metro. Gov't of Nashville-Davidson Cty.*, No. M2015-00455-COA-R3-CV, 2016 WL 4566095 (Tenn. Ct. App. Aug. 30, 2016) ("The reason tax assessments are excluded from evidence in condemnation cases is because such assessments are conducted for a purpose that is entirely different from establishing just

18

compensation for public acquisition of private property and because the tax appraiser uses a very different appraisal process for that purpose." (*quoting Knoxville Cmty. Dev. Corp. v. Bailey*, No. E2004-01659-COA-R3-CV, 2005 WL 1457750, at *4 (Tenn. Ct. App. June 21, 2005)) (in turn *quoting Wray*, 82 S.W. at 475))); *Knoxville Cmty. Dev. Corp. v. Bailey*, No. E2004-01659-COA-R3-CV, 2005 WL 1457750, at *1 (Tenn. Ct. App. June 21, 2005) (determining in an eminent domain case that the trial court had erred by instructing the jury members that "they could consider the tax assessment figures in their valuation of the property").

Respondents contend that this principle does not apply to cases such as the one at bar that involve a municipality's enforcement of its police power to condemn a building as uninhabitable rather than a taking of private property by eminent domain. Upon careful review, we agree with Respondents on this point. *See generally, Winters v. Sawyer*, 463 S.W.2d 705, 707 (Tenn. 1971) (holding that an "ordinance enacted pursuant to [the SCRA] falls squarely within the legitimate use of the police power.").

Pursuant to the section of the SCRA corresponding to Municipal Code 13-305(2), "the ordinance of the municipality may fix a certain percentage of such cost as being reasonable for such purpose" of determining that "the repair, alteration or improvement of the structure cannot be made at a reasonable cost in relation to the value of the structure." *See* Tenn. Code Ann. § 13-21-103(3)(B). In authorizing municipalities to enact an ordinance fixing the percentage of the repair cost in relation to the value when determining whether a structure should be demolished, the SCRA does not preclude municipalities from considering property tax assessments as evidence of property values. For example, in *PMFS H-View I*, this Court quoted the comparable ordinance enacted by the Metropolitan Government of Nashville and Davidson County as follows:

> If the repair, alteration, or improvement of such dwelling, structure, or accessory dwelling or structure cannot be made at a cost not to exceed fifty percent of the value of the dwelling or structure, requiring the owner within the time specified in the order to remove or demolish such dwelling or structure. <u>For the purposes of this article, the value of the dwelling or structure shall be assumed to be that established by the tax assessor's office.</u>

*PMFS H-View I*, 2019 WL 4727302, at *3 (quoting Metro Code § 16.24.590(2)) (emphasis added; emphasis in *PMFS H-View I* omitted).

We emphasize, however, that in the instant action, Municipal Code § 13-305 does not specify how the value of the premises is to be determined. Therefore, it was proper for the Board and the trial court to consider the totality of the evidence presented to it,

19

including Petitioner's testimony and the Tax Assessment, in determining the Property's value. In its written findings, the Board summarized Petitioner's testimony "that the cost of repairs, in relation to the market value of the building, would not exceed 50%" and also stated that the "tax assessor's information for the property [was] included" as part of an exhibit. The Board did not specify how it weighed the evidence in ultimately determining that "the costs to repair would exceed 50% of the value of the structure." The trial court in its amended final order determined that the Board's ruling had been supported by material evidence because according to the totality of the evidence, including Petitioner's testimony concerning the cost of repairs and the value of the Property, Official Turner's testimony and photographs reflecting the condition of the Building, and the Tax Assessment, the cost of repairs would have exceeded 50% of the Property's value.

We agree with the trial court. According to the tax assessment, even Petitioner's lowest estimate for the cost of repairs, $150,000.00, would have been nearly 150% of the assessed value of the Property at $101,000.00. As noted above, however, we have determined that substantial and material evidence supported a finding by the Board that the cost of repairs would have been at least as high as the highest amount of Petitioner's estimate at $200,00.00, meaning that the cost to repair the Building would have been nearly 200% of the Property's value. Assuming, *arguendo*, that Petitioner's testimony concerning the Property's value was the more accurate estimate, even at his highest estimate of $377,600.00, the $200,000.00 cost of repairs would have represented more than 50% of the Property's value. The trial court did not err in determining that the Board's decision to condemn and order the demolition of the Building, pursuant to Municipal Code § 13-305, was supported by substantial and material evidence.

## V. Remaining Issue

Petitioner also contends that the trial court erred by declining to find that a discussion during the end of the Board hearing indicated that because some Board members appeared willing to consider allowing a third-party successor owner to repair the Building, the Board's affirmance of the demolition order was not supported by substantial and material evidence of the repair cost-value ratio and was therefore arbitrary and capricious. Having determined that the trial court properly upheld the Board's ruling based on substantial and material evidence supporting a finding that the cost of necessary repairs to the Building would have exceeded 50% of the Property's value, pursuant to the criteria set forth in Municipal Code § 13-305, we further determine this issue concerning an ancillary discussion among Board members to be pretermitted as moot.

20

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment upholding the Board's affirmance of the demolition order.  We remand to the trial court for enforcement of the judgment and collection of costs below.  Costs on appeal are taxed to the appellant, Joe V. Williams.

_____
THOMAS R. FRIERSON, II, JUDGE